Opinion issued December 22, 2020



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-19-00765-CV

————————————

**MALIHA MOBEEN BEG, Appellant**

**V.**

**OMAR SHAKEEL, Appellee**

On Appeal from the 387th District Court
Fort Bend County, Texas
Trial Court Case No. 18-DCV-257509

## MEMORANDUM OPINION

This is an appeal from a final divorce decree. Following a bench trial, the trial court appointed Maliha Mobeen Beg and Omar Shakeel as joint managing conservators of their child, A.O., and appointed Omar as the conservator with the exclusive right to establish the primary residence of the child. In one issue, Maliha

contends that the trial court erred in appointing Omar as the conservator with the exclusive right to designate the primary residence of the child. We affirm.

## Background

A four-day bench trial began on June 18, 2019. The evidence presented to the trial court is set forth below.

### 1. Dr. Omar Shakeel

Omar and Maliha are both physicians. They married on January 2, 2015, in Atlanta, Georgia.

Following completion of his residency in Georgia, Omar hoped to begin a fellowship at Emory University so that he could remain in Atlanta while Maliha finished the last year of her residency. In January 2017, Omar was not selected by Emory but instead matched with the fellowship program at his second-ranked choice, Baylor College of Medicine (BCM), in Houston.

Omar testified that he and Maliha agreed on the day he matched that Maliha would move to Fort Bend County after she finished her residency in Atlanta. He testified that Maliha was very supportive of his coming to Texas. She told Omar that she had family in Texas, there was a large religious community in Fort Bend, and that Fort Bend was a good place to start a family.

2

Omar began his fellowship at BCM in July 2017. Maliha became pregnant later that year. During her pregnancy, Maliha came to Houston and Omar made trips to Atlanta so they could spend time together.

A.O. was born on April 29, 2018. Following A.O.'s birth, Maliha and A.O. went to Orlando, Florida, where Maliha's parents live, for her maternity leave. In June 2018, Maliha returned to Atlanta to finish the last month and a half of her residency. She completed her residency in July 2018.

In June 2018, Omar and Maliha signed a lease for a house in Sugar Land, in Fort Bend County. In a text thread with Omar and their realtor, Baljinder Mann, Maliha asked Mann about a possible reduction in rent for "when we renew next year . . . ." In the thread, Maliha sent a picture of A.O., stating "this baby wants a lawn and a swing set on that lawn."

In July 2018, Maliha texted Omar that she had completed her application for her Texas medical license. In the text, which included a picture of Maliha wearing a cowboy hat and flexing her bicep, Maliha wrote, "Yeehaw, ready for Texas."

Omar testified that, on August 2, 2018, he and Maliha moved all of their belongings from their townhome in Atlanta to their rental home in Fort Bend County. He stated that Maliha wanted the home they ultimately chose, but that it was not his first choice because the rent was significantly higher than his income and the five-bedroom house was more than they needed.

Omar testified that Maliha began applying for jobs at urgent care facilities in Houston in August 2018. In September 2018, Maliha received a job offer from Houston CareNow Urgent Care, PLLC. The employment agreement stated that "[f]or coverage of the Houston and Orlando markets, you agree to work a minimum of two (2) weekend shifts per month, or a minimum of eighteen (18) hours per month, unless the Medical Director dictates that the weekend requirements may be met using weekday shifts."

Omar testified that Maliha first approached him about working a two-week on/two-week off schedule in Orlando in October 2018. He testified that he told Maliha that it was not the ideal option for their family and begged her to reconsider but Maliha was adamant. When asked why he texted Maliha "[y]our job is too good to be true," Omar stated that he wanted to be supportive and only wanted to keep their family together. When Omar asked Maliha why she wanted to work in Orlando when she had a job offer in Houston at an equivalent pay rate, Maliha told him that only her mother could take care of A.O.

Omar testified that Maliha did not permit Omar's mother to care for A.O. On one occasion when Omar asked Maliha to allow his mother to pick A.O. up, Maliha responded, "I'm not going to drop the baby off to your mom." Omar testified that his mother is a neonatologist and cares for infants born before thirty-six weeks

4

gestational age. Omar testified that he believed Maliha valued her parents' relationship with A.O. over Omar's relationship with his daughter.

Maliha worked her first two-week shift in Florida from October 15 to October 29, 2018. Afterwards, she returned to Fort Bend County and remained there until mid-November. During that time, Omar and Maliha registered their vehicles, and Maliha obtained a Texas driver's license and registered to vote in Fort Bend County. Maliha returned to Orlando in mid–November and was scheduled to come back to Texas at the beginning of December, but she did not return.

Omar testified that it was extremely difficult for him during the periods when he was not able to see A.O. Omar believed that he and Maliha would be able to work things out and remain together as a family. In a conversation with Maliha that Omar recorded, Maliha can be heard telling Omar that if he and his family want to see A.O., they will have to go to Orlando.

On December 1, 2018, Omar flew to Orlando to speak with Maliha and her parents about his wish that Maliha and A.O. return home to Fort Bend County. Omar testified that Maliha's father told him that he needed to hire an attorney if he wanted to see his daughter. Maliha told Omar that she was not returning to Texas, and that if he wanted to see A.O., he would need to do so in Orlando. Omar testified that the longest stretch during which he was able to see A.O. in December was for four or five hours a day during a three-day period. Omar did not see A.O. in January 2019

5

but saw her in February 2019 after the parties appeared in court. Omar testified that he saw A.O. for four out of seventy-seven days between mid-November and the end of January.

Omar testified that he believed it was in A.O.'s best interest that he be named conservator with the exclusive right to designate her primary residence because he would encourage co-parenting with Maliha. Omar stated that he rarely got the chance to see A.O. when she was with Maliha. Omar testified that he wanted to create an environment in which both parents were close to A.O. He acknowledged that A.O. had been with Maliha more than she had been with him. Omar believed that Maliha did not want him to be a part of their child's life. Omar testified that the hostility with Maliha's family would lessen if A.O. lived in Fort Bend County.

Omar testified that, if he were the primary conservator, he would involve Maliha in the decision-making regarding A.O. With regard to the routine he would have if he were granted primary custody, Omar testified that his father, who is currently living with him, would be able to watch A.O. while Omar was at work. Omar testified that his weekends were generally free. He stated that he had also arranged for a nanny as well as a Montessori teacher to care for A.O., if needed. Omar testified that he hoped that Maliha would be heavily involved in A.O.'s routine as well.

Omar testified that he would have limited access to A.O. if she lived with Maliha in Florida. On his weekend periods of possession, he would be able to see A.O. approximately twenty-four hours with five of the hours spent driving between Orlando and Clearwater, Florida, where his parents live. Omar testified that if A.O. resided in Fort Bend County, he hoped that Maliha would move to Texas permanently.

Omar testified that the job prospects for Maliha, who is a general family practitioner, are better in Texas that in Florida, and that Maliha has described the Florida market as saturated. Omar also testified that Maliha would not suffer emotionally if she moved to Texas because several of her family members live nearby and in Dallas, and there is a large Muslim community in Fort Bend County. Omar testified that he could not move to Florida because of his fellowship, explaining that his career in pediatric oncology, a highly specialized field, would be best served by remaining in Houston because patients come from around the world for treatment in Houston. He testified that if he did not complete his fellowship, he would be unable to become a certified pediatric oncologist, and that there was no option to transfer, given his specialized field. Omar testified that he planned to live in Houston while completing his fellowship and working as an assistant instructor until July 2021. Afterwards, he intended to remain in the Houston area to continue practicing in his specialty. Omar testified that he and Maliha chose Fort Bend

County in part because the school district is very strong and there are numerous extracurricular and cultural opportunities.

On cross-examination, Omar testified that he had not raised any objection when he found out Maliha had accepted a job offer in Florida. Omar acknowledged that there are fellowships in Florida. He also testified that Maliha told him that he could leave his fellowship and move to Florida to be with his family.

## 2. Dr. Jennifer Foster

Dr. Foster is an attending physician in the pediatric oncology center at Texas Children's Hospital. She has been Omar's supervisor and clinical mentor during his fellowship. She described Omar as "the nicest and gentlest person I've met" and stated that his patients love him.

Dr. Foster testified that Omar is an incredible father. She testified that she attended a birthday party for one of the fellows at which Omar and A.O. were present, and that Omar doted on his daughter. She also invited them for dinner at her house and described Omar as a wonderful father in his interactions with A.O.

Dr. Foster testified that, in the first year of his fellowship, Omar was very excited that Maliha was going to move to Texas, and that he flew to see her every weekend he could. She testified that, once Maliha became pregnant, all that Omar talked about was being together as a family in Houston.

Dr. Foster stated that Texas Children's Hospital is very highly regarded and is ranked among the top three children's hospitals and cancer centers nationally. She stated that pediatric oncology is a very small community. She testified that there are no fellowships comparable to the one that Omar is in anywhere in the country, and that Omar cannot transfer his fellowship elsewhere. She testified that the current fellowship is three years, but that Texas Children's Hospital is one of the rare programs that builds in a fourth year. Dr. Foster testified that, although the fourth year is not required, it is incredibly difficult to find a job in pediatric oncology after only three years, and that many fellows who graduate after three years from other programs do not find a job in pediatric oncology. She testified that the fourth year allows a fellow to become an expert in the field, and that she has not had a fellow who did not complete a fourth year. Dr. Foster stated that, in her opinion, if Omar left his fellowship, he would not become an oncologist but that he would be able to apply for a general pediatric position. Dr. Foster stated that if Omar finished his fourth year, he could have a career in Houston.

On cross-examination, Dr. Foster testified that Omar was on track to complete his third year of the fellowship in June 2020. She testified that Omar currently worked an average of sixty hours a week as well as some weekends and nights. She stated that the schedule comes out a year in advance. She testified that the second and third years of the fellowship consist of months that are 100% clinical work and

9

other months that are research work, which is similar to an 8-to-5 job, and that the fourth year of the fellowship is 25% clinical work and 75% research work.

### 3. Savini Britto

Savini Britto met Omar and Maliha during their residency at Emory. Britto is a second-year pediatric gastroenterology fellow at Texas Children's Hospital. Britto testified that she became good friends with Omar and was friends with Maliha.

Britto and Omar both matched for fellowships at BCM. Britto testified that she and her husband shared an apartment with Omar in Houston for the first year of the fellowship while Maliha finished her residency in Atlanta. She testified that Omar's and Maliha's plan was that Maliha would move to Houston after she finished her last year of residency.

In the fall of 2018, Maliha spoke to Britto about her job options and the areas in Houston she was considering. Britto testified that Maliha had a lot of job flexibility because she was not specializing, and that Maliha already had job prospects in Houston. Britto testified that Omar and Maliha saw each other frequently the first year of his fellowship. Britto believed that once A.O. was born and Maliha finished her residency, they would come to Houston. Britto testified that Omar spent his free time in the first year of his fellowship scheduling house showings, and that he found one that Maliha loved even though it meant a commute

10

for him. Britto testified that Omar tries to do everything he can to make the people around him happy, especially Maliha.

In September 2018, Britto and her husband visited Omar, Maliha, and A.O. in their Sugar Land home. Britto testified that all of the family's furnishings from Atlanta as well as Maliha's car were at the home. Britto did not have the impression that Maliha was visiting or that she was there only temporarily, but rather that Maliha had moved and now lived there.

Britto testified that when Omar is with A.O., he wants to hold her rather than put her in a stroller and is very protective of her. Britto described Omar as a genuine, selfless person who is positive and optimistic with a lot of great energy. She testified that Omar has changed since the divorce. She testified that he is still positive but more cautious, and that he has become stronger.

Britto testified that, in her opinion, Omar should be designated as primary parent with the exclusive right to designate A.O.'s residence. She stated that it has been difficult for Omar to have a relationship with A.O., and that if he were designated as primary parent, he would want A.O. to have a relationship with Maliha.

On cross-examination, Britto testified that Maliha told Omar that he had an open invitation to see A.O. in Orlando whenever he wanted. Britto further testified that Omar did not want to do that for several reasons, one of which was that the visits

11

would take place in Maliha's family's home. Britto testified that Omar told her in November 2018 that Maliha had accepted a two weeks on/two weeks off job in Florida months earlier.

On redirect, Britto testified that Omar knew that Maliha wanted to work in Florida and that he agreed to the arrangement to make her happy. Britto stated that Maliha did not return to Texas after the second two-week period in Florida. She testified that Maliha was supportive of Omar attending the fellowship at BCM.

### 4. Omar Shakeel[1]

Omar testified that he tried to Facetime with A.O. on a daily basis but that he was only able to do so once or twice a week on average. Omar testified that Maliha is very loving and caring toward A.O., but he did not believe that she makes good decisions with regard to their daughter. Among other reasons, Omar cited the fact that Maliha took A.O. to live in Florida. He also testified that A.O. had a wonderful pediatrician when she lived in Texas, but when Maliha took A.O. to Florida, she changed healthcare providers without his knowledge. He further testified that although he has asked Maliha, he does not know who A.O.'s new pediatrician is.

Omar testified that, in accordance with the trial court's temporary orders issued prior to trial, Maliha indicated that she had set up a primary residence in Katy,

---

[1] Omar resumed his testimony after Dr. Foster and Savita Britto were taken out of turn.

12

Texas. Omar stated that he did not believe that Maliha had done so because, with the exception of one occasion, each time Omar went to the Katy residence to pick up or drop off A.O., Maliha's mother, not Maliha, was present. He further testified that there were other occasions when Maliha asked him to drop A.O. off at the airport or at an unknown person's house in Sugar Land.

Omar believed that he was permitted more access to A.O. during the proceedings because Maliha had new counsel, and that if it were up to Maliha, he would not be granted access to A.O. Omar testified that when he texted Maliha to ask to see A.O for a few hours, Maliha responded "stop harassing me." When he requested an extra half-hour with A.O. on Father's Day, Maliha responded, "I have plans. You need to drop her."

### 5. Fauzia Shakeel

Dr. Fauzia Shakeel is Omar's mother and A.O.'s paternal grandmother. She is a neonatologist at John Hopkins Children's Hospital in St. Petersburg, Florida. She lives in Clearwater, Florida.

Dr. Shakeel testified that Maliha never allowed her to pick up or drop off A.O. when Omar was not home. She testified that, on one occasion, Maliha refused to leave A.O. with her because Omar was running ten minutes late and had not yet arrived home from work. On another occasion when Dr. Shakeel picked them up at

the airport, Maliha refused to leave A.O. alone in the car with her for a few minutes while she and Omar went into a drugstore for diaper cream.

Dr. Shakeel testified that, at the beginning of Omar and Maliha's marriage, she loved Maliha like her own daughter. She testified that she held a wedding reception for more than 500 people and gave Maliha family heirlooms to welcome Maliha into the family. Dr. Shakeel testified that she remained at the hospital with Maliha for the twenty hours she was in labor.

Dr. Shakeel testified that when Omar and Maliha called her to tell her that Omar had not matched with Emory, Maliha said that they had listed Houston as their second choice because she had family there and she loved Houston. At counsel's request, Dr. Shakeel read the following paragraphs of the Petition to Establish Parent Responsibilities that Maliha filed in Florida court:

> The paternal grandparents are extremely strict, have a conservative view on how to raise children, and will intervene in the child's life from the beginning as they do with their son, and will not allow the mother to have any input if they gain control of their child through their son who is extremely under their influence.
>
> . . . .
>
> In Pakistani culture, some mother[s]-in-law[] expect the daughter to be submissive in [sic] their husband and his family. This is what Mother is facing and now her child is being used as a pawn to teach her a lesson for being an independent-minded, professional woman who wishes to live her life and raise her child, who's also a girl, without the backwards influence of her mother–in-law's thinking.

Dr. Shakeel testified that she was in her mid-thirties when she came to the United States. Although she had already worked as a physician in Pakistan, she redid her board certifications in the United States and completed her residency while she had two young children. Dr. Shakeel stated that she was proud that her son married a professional woman, and that her daughter, Omar's sister, is a first-year medical student.

Dr. Shakeel testified that Omar is an amazing father and takes care of all of A.O.'s needs. She testified that she does not influence Omar, and that he has been making his own decisions since he left home at eighteen years old. She testified that Maliha has ridiculed Omar and put him down in private and public. Dr. Shakeel testified that if Omar were awarded the right to designate A.O.'s primary residence, he would be fair toward Maliha and share in the decision-making regarding A.O. She further testified that she did not believe that Maliha would make efforts to co-parent with Omar.

**6.    Shakeel Saleh**

Shakeel Saleh is Omar's father and A.O.'s paternal grandfather. He was retired at the time of trial.

Mr. Shakeel testified that he and Omar's mother welcomed Maliha into their home as a daughter. He testified that it became evident in the first year of Omar and Maliha's marriage that something was not right. He testified that neither he nor

Omar's mother had an argument with Maliha or said a harsh word toward her. He testified that he and Omar's mother were not involved in Omar's and Maliha's day-to-day decisions. He testified that, by the time A.O. was born, Maliha and her parents had already pushed Omar's family into the background. Mr. Shakeel testified that he was offended when he learned that Maliha had hired a private investigator to watch him and Omar while they were caring for A.O.

Mr. Shakeel testified that Omar is a very loving father who takes care of A.O. and makes her happy. He testified that A.O. is Omar's entire universe and that he talks only about her. Mr. Shakeel stated that he could move to Houston permanently to help care and provide support for A.O. He testified that Omar is a very generous person and that, as a co-parent, he would be more than happy to accommodate Maliha's needs.

Mr. Shakeel testified that, in accordance with Pakistani culture, they tried to help reconcile Omar and Maliha but that they were rebuffed each time. He testified that a meeting was scheduled for a Friday evening with both sets of parents, Maliha's aunt and uncle, and another couple who would act as neutral third parties. On Friday morning, Maliha called off the meeting because she wanted to be present and was working that evening.

16

### 7. Dr. Maliha Beg

Maliha testified that she did not have any personal issues with Omar, and that she was happy with him until his parents began to interfere in their lives. She testified that her marriage to Omar became unhealthy when he began relying on his parents' opinion regarding how they should live their lives and involving them in the couple's day-to-day discussions.

Maliha testified that she only visited Texas twice, and that it was never her intention to move to Texas. She testified that she registered to vote in Fort Bend County as well as registered her car, obtained a driver's license, and co-signed a lease in Fort Bend County. She acknowledged that she has not done any of those things in any other place she has only visited. She stated that she only applied for a Texas driver's license and registered to vote in Fort Bend County because Omar insisted that she do so.

Maliha testified that she moved some of her belongings to Florida after she began her maternity leave shortly after A.O.'s birth. She stated that she decided in May 2018 that she wanted to live permanently in Orlando. She applied for jobs in the Houston area because she was interested to see what the job market was like.

On August 22, 2018, Maliha signed a professional services agreement with Inpatient Medicine Associates, LLC to work in Florida. On September 5, 2018, she received a verbal job offer from a Houston employer. She later emailed the Houston

17

employer to notify them that she had not received the written contract. She testified that she showed Omar the Houston job offer letter. Maliha testified that Omar was a kind and loving husband, but that he lied to her and that he mainly cared about himself and no one else.

Maliha testified that she offered Omar time with A.O. in Florida but acknowledged that the time offered was during the workweek. She stated that she wanted the visits to be in Orlando so that she could be available if anything happened to A.O., or if A.O. needed her. Maliha stated that she did not think it would be good for A.O. to be away from her for multiple nights to spend time with Omar because A.O. had never been away from her that long. She stated that she offered Omar the opportunity to spend time with A.O. in December 2018 and January 2019, but he declined the offers. Maliha stated that Omar made the choice to not see A.O. during that time period.

Maliha testified that she allowed Omar to have Facetime contact with A.O. in December 2018 and January 2019, and that she sent photographs of A.O. to Omar even after she was served with divorce papers. She stated that she invited Omar to A.O.'s first birthday party but that he declined when he discovered the party would take place in Orlando. She testified that she maintained communication with Omar regarding how A.O. was doing, the milestones she reached, and how she was sleeping.

Maliha testified that, in accordance with the temporary orders, she and A.O. moved to Texas in March 2019. She stated that she was living with her cousin with whom she signed a lease agreement. After the temporary orders hearing, Maliha took steps to apply for a Texas medical license. She stated that it would take eighteen to twenty-four weeks to obtain her permanent medical license, and that she would be unable to apply for a job before she obtained the license. Maliha acknowledged that, as a general practitioner, she could be as successful in Houston as in Orlando.

Maliha testified that the plan was for Omar to complete his three-year fellowship in Houston, and then the family would move to Florida. She stated that the first time she heard Omar talk about doing a fourth year was after he filed for divorce.

Maliha testified that if the judge permitted her to designate Florida as A.O.'s primary residence, she would keep her current job. She stated that her job is very flexible, and that she works 7:00 a.m. to 12:00 p.m. for seven days, with one day when she is on call until 7:00 pm., and then she has seven days off. Maliha stated that A.O. has a nursery in her parents' home in Florida, and that Maliha's room is next door. A.O. has a lot of toys and her uncle has a dog that she loves to play with. Maliha stated that she took A.O. to Disneyworld every other weekend when they lived in Florida.

Maliha denied texting Omar "stop harassing me" in response to his request for more time with A.O. on Father's Day. She stated that she told him that she had a Father's Day party to attend for her own father. She testified that, in response to his repeated requests for extra time a few days earlier, she replied, "No, let's just follow the court order," and that when he asked again, she replied "stop harassing me about this."

With regard to Omar's testimony that he picked A.O. up at the airport, Maliha testified that her grandfather had passed away and that she had asked Omar to pick A.O. up at the airport so that she could go to Florida to be with her family. She stated that Omar knew that her grandfather had passed.

Maliha testified that when she got the job in Florida, Omar told her that he was going to support her because he agreed that it was best for their family. She stated that Omar told her he was worried about what he would tell his mother, who was due to come to Houston in October. Maliha testified that, prior to October, she and Omar had agreed that A.O. would not be put in daycare, but that he changed his mind at the end of October. She testified that, before she began working, she was taking care of A.O., staying up at night with her, and doing all of the feedings because Omar had a full-time job and she wanted him to be well rested.

Maliha stated that Omar's mother was constantly interfering in their lives. She stated that, after A.O. was born, she took A.O. to see Omar's parents in Clearwater

20

on a monthly basis. She stated that the visits were difficult because Omar's family was never really friendly toward her. She testified that Omar, his parents, and his sister would take A.O. behind closed doors for hours at a time while Maliha was at the house. Maliha testified that Omar's father used to respond to her calls and text messages, but, after 2016, he would not answer her phone calls.

Maliha testified that she preferred that there be no geographical restriction in the final order because it was not clear where Omar would start his career. She further testified that both sets of grandparents are in Florida, and that she has a stable, permanent job in Florida with no night shifts. Her place of work is two miles from her parents' house where she currently lives. Maliha testified that if the court placed a geographical restriction of Fort Bend County, then Maliha would need time to find a similar job to the one she has in Florida.

### 8. Azra Beg

Azra Beg is Maliha's mother and A.O.'s maternal grandmother. She testified that she has been in Fort Bend County with Maliha and A.O. since the trial court issued a temporary order restricting A.O.'s residence to Fort Bend County.

Mrs. Beg testified that, prior to the divorce, Omar told her that he planned to apply to Nemours Children's Hospital in Orlando, Florida, because it was his dream to join the faculty there. She stated that Omar also told her that he knew of a doctor retiring at Nemours in three years, and that he wanted to take his position. Mrs. Beg

testified that Omar told her that Maliha's job in Orlando was "too good to be true," and that Maliha was getting everything she wanted and would not have to work too much. Mrs. Beg stated that Omar never expressed anything other than excitement about the job Maliha had in Orlando. She testified that Omar told her during the second year of his fellowship that he had only one year left.

Mrs. Beg testified that Maliha is a very loving mother and is always with her daughter. She stated that Maliha typically began work at 7:00 a.m. and usually returned home around 1:00 p.m. Mrs. Beg testified that if the court designated Fort Bend County as a geographical restriction for A.O., she would move to Fort Bend County with Maliha.

### 9. Mirza Beg

Mirza is Maliha's father and A.O.'s maternal grandfather.

Mr. Beg testified that Omar told him that he planned to move to Florida once he completed his three-year fellowship, and that Omar expressed interest in working at Nemours Hospital. Mr. Beg stated that Omar never told him that his fellowship would last four years or that he planned to stay in Houston. He further testified that Omar described Maliha's job in Florida as "too good to be true."

Mr. Beg testified about an incident in December 2018 when he returned home to find Omar holding A.O. outside, pacing in the driveway, and talking to someone on the phone. Mr. Beg thought he saw Omar's father parked in a supermarket

parking lot across the street. When Mr. Beg approached Omar, he asked whether that was Omar's father parked across the street, and Omar replied that it was not. According to Mr. Beg, Omar then stated, "[y]ou have to force Maliha to quit her job. If not, I am going to take away the 7-month old baby from her." He told Omar that it was in A.O.'s best interest that Maliha worked in Florida for fourteen days and then return to Omar in Houston for sixteen days. Mr. Beg testified that he told Omar that Maliha would cook for him, take care of A.O., and earn money so they could take vacations. Mr. Beg stated that Omar responded that his mind was made up. Mr. Beg acknowledged that he became upset when Omar's father pulled up in the driveway, and that he told Omar, "you don't have the balls to tell the truth." Mr. Beg testified that Omar then grabbed his genitals and began yelling. Mr. Beg left to go pick up Maliha from work. When they returned, Mr. Beg left Omar and Maliha to talk. He admitted telling Omar that he would need a lawyer if he wanted to take the baby.

Mr. Beg stated that Maliha is a wonderful mother and that her life revolves around A.O. He believed that A.O. should live primarily with Maliha. He stated that he and his wife were supportive of Maliha through the divorce process but that they did not interfere in her life.

**Trial Court Ruling**

23

On June 24, 2019, the trial court issued a written ruling, appointing Omar and Maliha as joint managing conservators of A.O., and awarding Omar, among other things, the exclusive right to establish A.O.'s primary residence within Fort Bend County and contiguous counties. On July 22, 2019, the trial court signed a final decree of divorce which reflected the June 24, 2019 ruling.

On August 20, 2019, Maliha filed a motion for new trial and set it for hearing. Maliha and her counsel failed to appear at the hearing. On October 2, 2019, the trial court entered an order denying the motion.

## Discussion

On appeal, Maliha contends that the trial court erred by appointing Omar as the conservator with the exclusive right to designate the primary residence of A.O.

### A. Standard of Review

Trial courts have wide discretion with respect to conservatorship, control, possession, and visitation matters involving the child. *See In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007); *Compton v. Pfannenstiel*, 428 S.W.3d 881, 886 (Tex. App.—Houston [1st Dist.] 2014, no pet.). We review a trial court's decision on conservatorship matters for an abuse of discretion and reverse the trial court's order only if we determine, from reviewing the record as a whole, that the trial court's

decision was arbitrary or unreasonable. *Patterson v. Brist*, 236 S.W.3d 238, 239–40 (Tex. App.—Houston [1st Dist.] 2006, pet. dism'd) (citing *Turner v. Turner*, 47 S.W.3d 761, 763 (Tex. App.—Houston [1st Dist.] 2001, no pet.)). A trial court abuses its discretion if it acts without reference to any guiding rules and principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985). Legal and factual sufficiency are not independent grounds of error but are relevant factors in assessing whether the trial court abused its discretion. *Townsend v. Vasquez*, 569 S.W.3d 796, 807 (Tex. App.—Houston [1st Dist.] 2018, pet. denied).

To determine legal sufficiency of the evidence, a reviewing court determines whether the evidence would enable reasonable people to reach the judgment being reviewed. *Id.* The reviewing court must consider the evidence in the light most favorable to the trial court's decision and indulge every reasonable inference that would support it. *See id.*; *Epps v. Deboise*, 537 S.W.3d 238, 242–43 (Tex. App.—Houston [1st Dist.] 2017, no pet.). The reviewing court considers favorable evidence that a reasonable factfinder could consider and disregards contrary evidence unless a reasonable factfinder could not disregard it. *Stamper v. Knox*, 254 S.W.3d 537, 542 (Tex. App.—Houston [1st Dist.] 2008, no pet.). If the evidence allows for only one inference, the reviewing court may not disregard it. *Epps*, 537 S.W.3d at 243.

To determine factual sufficiency, a reviewing court considers all of the evidence that either supports or contradicts the factfinder's determination. *Id.* The factfinder's finding is set aside only if the evidence supporting it is so contrary to the overwhelming weight of the evidence as to be clearly wrong or unjust. *See id.* The reviewing court may not simply substitute its judgment for the factfinder's; the factfinder is the sole judge of the witnesses' credibility and the weight to be given their testimony. *Id.* Ultimately, there is no abuse of discretion as long as some evidence of a substantive and probative character exists to support the trial court's decision. *Id.*

In a bench trial, the trial court, as the trier of fact, is the sole judge of the witnesses' credibility and the weight to be given their testimony. *Townsend*, 569 S.W.3d at 808. "The trial court is in the best position to observe the demeanor and personalities of the witnesses and can 'feel' the forces, powers, and influences that cannot be discerned by merely reading the record." *Bates v. Tesar*, 81 S.W.3d 411, 424 (Tex. App.—El Paso 2002, no pet.).

When no findings of fact or conclusions of law are requested or filed, as here, we imply all facts necessary to support the judgment that are supported by the evidence. *See Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990). We affirm the trial court's judgment if it can be upheld on any legal theory finding support in the evidence. *Id.*

## B. Applicable Law

When a trial court appoints joint managing conservators, it must designate the conservator who has the exclusive right to determine the primary residence of the child. TEX. FAM. CODE § 153.134(b)(1). It must either establish a geographic area within which the conservator shall maintain the child's primary residence or specify that there are no geographic restrictions. *Id.* "Suits affecting the parent-child relationship are intensely fact driven, which is why courts have developed best-interest tests that consider and balance numerous factors." *Lenz v. Lenz*, 79 S.W.3d 10, 19 (Tex. 2002). "The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child." TEX. FAM. CODE § 153.002. The trial court has wide latitude in determining what is in the best interest of the child. *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982).

When appointing parents as joint managing conservators and determining the conservator with the exclusive right to designate the child's residence, a trial court must consider the following factors:

(1) whether the physical, psychological, or emotional needs and development of the child will benefit from the appointment of joint managing conservators;

(2) the ability of the parents to give first priority to the welfare of the child and reach shared decisions in the child's best interest;

(3) whether each parent can encourage and accept a positive relationship between the child and the other parent;

(4) whether both parents participated in child rearing before the filing of the suit;

(5) the geographical proximity of the parents' residences;

(6) if the child is 12 years of age or older, the child's preference, if any, regarding the person to have the exclusive right to designate the primary residence of the child;[2] and

(7) any other relevant factor.

TEX. FAM. CODE § 153.134(a).

## C. Analysis

Maliha contends that "[r]eviewing the record in light of the factors under section 153.134(a), the evidence shows that the trial court's order appointing Omar as the joint managing conservator with the exclusive right to designate the child's primary residence was against the great weight and preponderance of the evidence."

As to the first factor—the physical, psychological, and emotional needs and development of the child, *see* TEX. FAM. CODE § 153.134(a)(1)—the evidence presented at trial shows that Omar and Maliha are both caring and loving parents who are meeting the physical, psychological, and emotional needs of A.O. Dr. Foster testified that Omar is an incredible father who dotes on his daughter. Britto testified that when she observed Omar with A.O., the child appeared happy and

---

[2] As A.O. is not twelve years or older, this factor is not relevant to our analysis.

bonded with him. Britto and Mr. Shakeel testified that Omar constantly carries A.O., loves to hold her, and is very protective of her. Mr. Shakeel testified that A.O. is Omar's whole universe and that he talks only about her. Dr. Shakeel testified that Omar is very patient and kind with A.O., and that he takes care of all of her needs. Maliha also testified that she believed Omar was capable of feeding, changing, and caring for A.O. and making good educational decisions for her, and that A.O. is safe with Omar.

The evidence also showed that Maliha is a very loving mother who is devoted to A.O. Maliha's parents testified that Maliha is a wonderful mother whose life revolves around her daughter. Omar also testified that Maliha is very loving and caring toward A.O., although he does not believe that she makes good decisions with regard to their daughter.

The second factor considers the parents' ability to prioritize the welfare of the child and reach shared decisions in the child's best interest. *See id*. § 153.134(a)(2). Omar testified that if he were awarded the exclusive right to designate A.O.'s primary residence, he would encourage co-parenting with Maliha and would create an environment in which both parents were involved in the decision-making regarding A.O. He stated that he rarely got the opportunity to see A.O. when she was with Maliha, and he believed that Maliha did not want him to be a part of their child's life. He stated that A.O. had a wonderful pediatrician when she was in Texas,

29

but when Maliha took A.O. to Florida, she changed healthcare providers without his knowledge. He further testified that although he has asked Maliha, he does not know who A.O.'s new pediatrician is.

Britto stated that it has been difficult for Omar to have a relationship with A.O. since she has been in Florida, and that if Omar were designated as primary parent, he would want A.O. to have a relationship with Maliha. Dr. Shakeel testified that Omar would be fair toward Maliha and share in the decision-making regarding A.O. if he were awarded the right to designate A.O.'s primary residence, but she did not believe that Maliha would make efforts to co-parent with Omar. Mr. Shakeel stated that Omar is a very loving and generous person and that, as a co-parent, he would be more than happy to accommodate Maliha's needs. Maliha testified that Omar was a kind and loving husband but that he primarily cared about himself and no one else. She also testified that, other than the question of where A.O. lives, she and Omar had not disagreed about caring for A.O.

The third factor considers whether each parent can encourage and accept a positive relationship between the child and the other parent. *See* § 153.134(a)(3). Omar testified that, over his objections, Maliha decided to accept a job in Orlando and move to Florida and that, as a result, he was not able to see his daughter for extended periods of time. He testified that he begged Maliha to reconsider her decision but that she was adamant. Omar testified that he believed Maliha valued

her parents' relationship with A.O. over his relationship with his daughter. Omar testified that Maliha told him that she was not returning to Texas, and that if he wanted to see A.O., he would need to do so in Orlando. Omar testified that the longest stretch during which he was able to see A.O. in December was for four or five hours a day during a three-day period, and he only saw her four out of seventy-seven days between mid-November and the end of January. Omar stated that he tried to Facetime with A.O. on a daily basis, but that he is only able to do so once or twice a week on average. Omar testified that when he texted Maliha to ask her for additional time with A.O, including on Father's Day, Maliha refused and replied, "stop harassing me."

Maliha testified that Omar had an open invitation to see A.O. in Florida but acknowledged that the time she offered Omar was during the workweek. Maliha stated that she allowed Omar to have Facetime contact with A.O. in December 2018 and January 2019, even though there was no court order requiring her to do so, and that she sent photographs of A.O. to Omar even after she was served with divorce papers. Maliha acknowledged that it is hard to keep A.O.'s attention on Facetime calls because, at eight months old, A.O. has a short attention span. Maliha testified that she invited Omar to A.O.'s first birthday party but that he declined when he discovered the party would take place at her family's home in Orlando. She testified

that she maintained communication with Omar regarding how A.O. was doing, the milestones she reached, and how she was sleeping.

Britto testified that she has observed how hard it has been for Omar to have a relationship with his daughter since she has been in Florida. She further testified that, if Omar were the primary parent, he would want A.O. to have a relationship with both parents.

The fourth factor considers whether both parents participated in child rearing before suit was filed. *See id.* § 153.134(a)(4). Maliha argues that this factor is overwhelmingly in her favor. She contends that the undisputed evidence shows that, even at the time of trial, A.O. had spent more time with her than Omar. She testified that, both before and after she began working, she was A.O.'s primary caregiver and changed the majority of the diapers and took care of late-night feedings.

At trial, Omar acknowledged that A.O. had been with Maliha more than she had been with him since she was born. We note, however, that the proper inquiry is whether both parents participated in child rearing rather than which parent did more of the child-rearing activities or spent more time with the child. *See id.* The record shows that Omar also participated in child-rearing activities, including changing A.O.'s diapers and putting her to sleep.

As to the fifth factor—the geographical proximity of the parents' residences, *see id.* § 153.134(a)(5)—there is a significant amount of conflicting evidence

regarding the parties' intentions as to A.O.'s primary residence. Omar testified that the plan had always been for Maliha and A.O. to live in Texas after Maliha completed her residency. He stated that Maliha was supportive of his coming to Houston once he matched with BCM, and that she told him that she had family in Texas and a lot of support in Houston, and that there was a large Muslim community in Fort Bend. Dr. Shakeel testified that Maliha told her that Houston was a choice they selected together and that she loved Houston. Maliha sent a text message to Omar stating, "Yeehaw, ready for Texas" at the end of July 2018.

Britto testified that she saw all of Maliha's belongings in the Fort Bend County home, and she had the impression that Maliha had moved and now lived there rather than merely visiting. She further stated that she and Maliha talked about Maliha's move to Fort Bend County and her job prospects there. The evidence also showed that Maliha signed a residential lease in Texas in June 2018, Maliha and Omar rented a moving truck and moved all of their belongings from Atlanta to Sugar Land, Maliha obtained a Texas driver's license and registered her vehicle in Texas, and she registered to vote in Fort Bend County.

Maliha testified that she and Omar had always planned for her to move to Orlando with A.O. after completing her residency, and that Omar would join her after he completed his fellowship. She testified that she took the Orlando job after consulting with Omar, and that Omar was in favor of her taking the job because it

33

was the best thing for their family. She stated that Omar was in favor of the plan until he changed his mind in October 2018. Maliha testified that Omar texted her stating that her job was "too good to be true." Maliha's parents also testified that Omar told them the same thing regarding Maliha's job. Omar acknowledged that he sent the text, but he stated that he did so because he wanted to be supportive and wanted to keep their family together.

Finally, Maliha asserts that her ability to provide personal care to A.O. was another relevant factor that the trial court should have considered in making its determination. *See id.* § 153.134(a)(7). She points to evidence showing that her job in Florida only required her to work five or six hours a day for approximately thirteen or fourteen days a month, and that her workplace was only two miles from her parents' home. She stated that a family member would care for A.O. while she was at work, and that A.O.'s room was next door to hers.

The record also shows that while Omar's first year of fellowship was more rigorous, the remaining years were less so. Omar's supervisor, Dr. Foster, testified that in the fourth year of the fellowship, Omar's work would be 75% research work, which is more akin to an 8-to-5 job. Omar testified that his father had moved to Fort Bend County and could help him care for the child while Omar was at work. Omar stated that on the days he saw patients, he would be home between 4:00 and 5:00 p.m., and that his weekends were generally free.

Considering all the evidence, we find that the trial court's actions were neither arbitrary nor unreasonable. Therefore, we cannot conclude that the trial court abused its discretion in appointing Omar as the joint managing conservator with the exclusive right to establish A.O.'s primary residence. *See Mize v. Mize*, No. 2-08-163-CV, 2009 WL 279335, at *6 (Tex. App.—Fort Worth Feb. 5, 2009, no pet.) (mem. op.) ("Giving great deference to the trial court's decision because it observed the witnesses and was able to assess intangibles not apparent in the written record, we hold that the trial court did not abuse its discretion by appointing Robin as the joint managing conservator with the right to establish the children's primary residence."); *Swaab v. Swaab*, 282 S.W.3d 519, 535–36 (Tex. App.—Houston [14th Dist.] 2008, pet. dism'd) (holding that trial court did not abuse its discretion by appointing mother as joint managing conservator with exclusive right to establish child's primary residence when evidence showed that mother temporarily worked nights shifts during which father and babysitter helped care for child, mother moved to home with backyard, and father's house was messy); *Shoemake v. Shoemake*, No. 13-05-00421-CV, 2007 WL 1288815, at *6 (Tex. App.—Corpus Christi May 3, 2007, no pet.) (mem. op.) (affirming trial court's decision to give father right to determine children's primary residence even though record contained conflicting evidence that both mother and father could provide stable, loving environment).

Accordingly, we overrule Maliha's issue.

## Conclusion

We affirm the trial court's judgment.

Russell Lloyd
Justice

Panel consists of Chief Justice Radack and Justices Lloyd and Kelly.